J-S54016-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN RE: ADOPTION OF C.E.-M.J., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: S.A.J., FATHER | No. 748 MDA 2014 |

Appeal from the Decree March 31, 2014
In the Court of Common Pleas of Franklin County
Orphans' Court at No(s): 61-ADOPT-2013

| IN RE: ADOPTION OF F.N.J., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: S.A.J., FATHER | No. 749 MDA 2014 |

Appeal from the Decree March 31, 2014
In the Court of Common Pleas of Franklin County
Orphans' Court at No(s): 62-ADOPT-2013

| IN RE: ADOPTION OF J.M.J., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: S.A.J., FATHER | No. 750 MDA 2014 |

Appeal from the Decree March 31, 2014
In the Court of Common Pleas of Franklin County
Orphans' Court at No(s): 63-ADOPT-2013

BEFORE:  LAZARUS, J., MUNDY, J., and STABILE, J.

MEMORANDUM BY MUNDY, J.:                    **FILED NOVEMBER 05, 2014**

S.A.J. (Father) appeals from the March 31, 2014 decrees involuntarily terminating his parental rights to his three daughters, C.E.M.-J., born in July 2005, and, F.N.J. and J.M.J., who are twins born in November 2006 (the Children).[1]  Upon careful review, we affirm.

We summarize the relevant facts and procedural history as follows. The Children were born in York County, Pennsylvania, during the marriage of Father and J.M.D. (Mother).  Orphans' Court Opinion, 5/19/14, at 5.  In May 2008, when C.E.-M.J. was nearly three years old, and F.N.J. and J.M.J. were eighteen months old, Father placed the Children in the temporary custody of his sister, J.L.H. (Aunt), and her husband, D.P.H. (Uncle).  N.T., 3/25/14, at 11, 56, 110.  At the time, Father and the Children were living in the State of Georgia, with Father acting as the primary caretaker of the Children because Mother was in the military.  *Id.* at 56, 133.  Uncle and Aunt offered to take the Children for "a little while," so Father could make arrangements to relocate to Pennsylvania.  *Id.* at 56.  Father and Mother subsequently divorced, and Father relocated to Pennsylvania at a time not specified in the certified record before this Court.  *Id.* at 161, 177-178.

_____

[1] By the same decrees, the orphans' court involuntarily terminated the parental rights of the Children's mother, J.M.D., but she did not file notices of appeal.

Aunt and Uncle filed a custody action in Franklin County, Pennsylvania, against Father, and, by order dated August 6, 2010, Father, then living in the York or Lancaster area of Pennsylvania, was granted supervised visitation for three and one-half hours on an alternating weekly basis.[2] ***Id.*** at 20-21, 134, 161. In October 2011, Father re-married, and thereafter he and his wife, L.J. (Stepmother), resided in Elkland, Tioga County, Pennsylvania, which is a driving distance of approximately four to four and one-half hours from the home of Aunt, Uncle, and the Children in Shippensburg, Franklin County, Pennsylvania. ***Id.*** at 132, 159, 161.

On December 20, 2013, Aunt and Uncle filed petitions for the involuntary termination of parental rights of Father and Mother pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b). The orphans' court held a hearing on March 25, 2014, during which Uncle, Aunt, Stepmother, and Father testified. By decrees dated March 31, 2014, the orphans' court granted the petitions for the involuntary termination of Father's parental rights.[3] On April 30, 2014, Father timely filed notices of appeal and concise statements of errors

---

[2] Father appeared *pro se* in the custody action. N.T., 3/25/14, at 134. The custody order is not included in the certified record, and the record does not disclose the basis for the custody court's decision limiting Father's custody to supervised visitation.

[3] On April 10, 2014, the orphans' court issued two amended decrees at Nos. 61 ADOPT 2013 and 62 ADOPT 2013, respectively, to correct typographical errors. Orphans' Court Opinion, 5/19/14, at 1, n.2.

complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i), (b). On May 14, 2014, this Court consolidated the appeals *sua sponte*. **See** Pa.R.A.P. 513 (permitting consolidation of appeals where the same question is involved).

On appeal, Father presents the following issues for our review.

> I. Did the [orphans'] court err in determining [that Aunt and Uncle] presented clear and convincing evidence to terminate Father's parental rights under 23 Pa.C.S.A. § 2511(a)(1)?
>
> II. Did the [orphans'] court err in finding there was sufficient evidence that termination of Father's parental rights after analysis pursuant to 23 Pa.C.S.A. § 2511(b) was in the best interest of the [C]hildren?

Father's Brief at 4.

We review the decrees involuntarily terminating Father's parental rights according to the following standard.

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

- 4 -

> [T]here are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-827 (Pa. 2012) (citations omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

- 5 -

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Instantly, the orphans' court terminated Father's parental rights pursuant to Section 2511(a)(1) and (b), which provide as follows.

### § 2511. Grounds for involuntary termination

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

…

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A §§ 2511(a)(1), 2511(b).

With respect to Section 2511(a)(1), "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." *In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008), *citing In re Adoption of R.J.S.*, 901 A.2d 502, 510 (Pa. Super. 2006).

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*Id.*, *quoting* *In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1998).

This Court has emphasized that a parent does not perform his or her parental duties by displaying a "merely passive interest in the development of the child." *In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citation omitted), *appeal denied*, *In Re Adoption of N.M.B.*, 872 A.2d 1200 (Pa. 2005). We have explained this principle as follows.

> A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in

- 7 -

the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*Id.* (internal quotation and citations omitted)

With respect to Section 2511(b), this Court has explained the requisite

analysis as follows.

Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect

- 8 -

analysis necessarily depends on the circumstances of the particular case. *Id.* at 63.

***In re Adoption of J.M.***, 991 A.2d 321, 324 (Pa. Super. 2010).

In his first issue on appeal, Father argues that his conduct does not warrant termination of his parental rights pursuant to Section 2511(a)(1) because Aunt and Uncle "discouraged, obstructed and ultimately thwarted [his] efforts to remain a significant figure in his daughter[s'] lives." Father's Brief at 12. Father argues that the efforts he made to perform his parental duties were reasonable under the circumstances. Upon careful review, we disagree.

In its Rule 1925(a) opinion, the orphans' court articulated its factual findings as follows.

> Father offered evidence that he had made repeated attempts to have telephone contact with the [C]hildren, often calling multiple times a day and leaving messages; however, his calls were not returned by [Aunt and Uncle]. [Aunt and Uncle] acknowledged not answering the telephone if the [C]hildren were not able to speak with Father for some reason (meals[sic] time, not all children home, etc.). Father admitted that [Aunt and Uncle] asked that he call ahead to schedule a time to speak with the [C]hildren when all of the [C]hildren would be available to speak with him. Father refused to do as [Aunt and Uncle] asked and call ahead since the Custody Order did not require him to do so and his work as an over-the-road truck driver prevented him from being able to establish a set time for phone calls. Father's last telephone contact with the [C]hildren was in December of 2013 when he spoke with them for about 30 minutes.

The Custody Order required Father's time with the [C]hildren to be supervised. Specifically, the Custody Order awarded Father supervised visits on alternate Saturdays from 9:00 a.m. until 1:30 p.m. at the home of Paternal Grandparents. [Aunt] testified that Father maintained regular visits under the Custody Order for a year. After that he visited with the [C]hildren about on[c]e a month, and then less frequently until he completely stopped contacting [Aunt and Uncle] to schedule visits. According to [Aunt], Father's last visit occurred on June 23, 2012.

Initially, [Uncle] was willing to serve as the supervisor [of the visits] and did so. Father and [Uncle] set up times for visits via email. [Uncle] provided transportation to Paternal Grandparents' home in the York, Pennsylvania area where the visits took place. However, after July 2012, [Uncle] was unable to continue as the supervisor because of a change in his employment. By that time, Paternal Grandparents were also not willing to provide supervision for Father's visits. [Uncle] advised Father of his inability to continue to supervise visits and encouraged Father to find another supervisor. Father testified that he felt that he had done his share with respect to locating a suitable supervisor, and that it was up to [Uncle] to locate one by, for example, asking his church members. Father's last visit with the [C]hildren was supervised by a family acquainted with Father and approved by [Aunt and Uncle]; unfortunately, the family sold their home and embarked on a mission trip to Africa. Thereafter, [Aunt and Uncle] refused Father's request to permit Father's then fiancée (now wife) to supervise the visits.

Father also informally requested additional time with the [C]hildren after completing the four-hour program for separated and divorcing parents required of individuals prior to being granted a divorce decree in this judicial district. Father took the course in December, 2010, because completion of a parenting class was a prerequisite under the

Custody Order for Father to be awarded more time with the [C]hildren. He believed the course would satisfy the requirement; [Aunt and Uncle] did not believe the four-hour class satisfied the [custody c]ourt's directive and therefore refused Father's requests to expand his time. Father claims to have taken another course through his church, as well. The [custody c]ourt was never asked to examine and decide the issue.

Orphans' Court Opinion, 5/19/14, at 9-11. Upon review of the record, we conclude the testimonial evidence supports the orphans' court's findings.

Indeed, Father testified that, after completing the parenting class on December 9, 2010, Uncle and Aunt denied him increased visitation with the Children. Nevertheless, he did not request more visitation from the custody court because he could not financially afford a lawyer. N.T., 3/25/14, at 136-137. He further testified, "I could have done it on my own, but given my past experience in the [custody c]ourt, without a lawyer, I didn't want to go into [the custody c]ourt and lose more time with my kids…." *Id.* at 137. On cross-examination by counsel for Aunt and Uncle, Father testified with respect to the performance of his parental duties as follows.

Q. So is it your belief and your testimony today that you have been a parent to your children in the six months prior to the [involuntary termination] petition being filed in December, 2013?

A. As best as I was allowed to be.

Q. When you say you were allowed to be, what did you do to try to parent your children?

A. I made phone calls to make contact with them and they were not returned or answered.

- 11 -

Q.     And it is your belief that phone calls are enough to parent children?

A.     No.

Q.     Did you contact a lawyer about changing the Custody Order?

A.     I haven't had the financial means to do so.

Q.     Did you attempt contacting legal services to see if they could help you at a reduced or a free rate?

A.     Other than my lawyer standing present, no.

Q.     And that would have been you applied for her after you received the Petition?

A.     Correct.

Q.     Did you attempt to do the paperwork and file with the [custody c]ourt to be able to do things on your own to get this in front of a judge?

A.     I downloaded … many of the documents to do that, but because of my inexperience in law, I didn't know how to go about all of it, and I was afraid that if I tried – and I was given advice not to by some of my friends that I trusted, because they knew of friends of theirs that had done the same thing and went into [custody c]ourt and lost more.

Q.     But in 2013 you're essentially saying you had nothing with your children, correct?

A.     Yes.

Q.     So how could you lose more than nothing?

A.     That's a good point.

*Id.* at 164-165.  In addition, Father testified that since his last visit with the

Children in June of 2012, he has not written any letters to the Children.  *Id.*

at 182.  According to Father's own testimony, since the beginning of 2013,

while he purchased gifts, he did not provide the gifts to the Children.  *Id.* at

153.

On cross-examination by the guardian *ad litem* (GAL), Father testified

with respect to his share of responsibility for his lack of contact with the

Children:

> A.     I understand that basically that I need to
> do my part, and I think I've learned even through
> this part where we are right now, that legally I had
> more options, that I didn't really know . . . that were
> available to me, apart from knocking on their door,
> which has already been told to me I'm not allowed
> near their home.  So I didn't know if I was even
> allowed in their church, places that I could have
> gone to make myself known, to make my presence
> known in my daughters' lives, I didn't think were an
> option to me, because I'm not even allowed in their
> home.
>
> So I found out since this proceeding has
> started that I'm incorrect in that, that I should have
> been doing those things, and I wish I had.

*Id.* at 184.

With respect to the Children's best interests, Aunt and Uncle testified

that they intend to adopt the Children if Father's and Mother's parental

rights are terminated.  *Id.* at 36-37, 98.  Aunt testified that it is neither her

nor Uncle's intent to wholly exclude Father as a part of the Children's lives.

*Id.* at 98. Aunt explained, "[w]e hope that some day we can all be at family events together." *Id.*

Father acknowledged that it would be detrimental to remove the Children from Aunt and Uncle. *Id.* at 177. Father testified on cross-examination by counsel for Aunt and Uncle with respect to the Children's best interests, as follows.

> Q. [L]ooking at it from your kids' perspective, who have been … mom and dad to them?
>
> A. [Aunt and Uncle] have.
>
> Q. And is it your position that making that permanent by allowing them to be adopted is not in their best interest?
>
> A. They have been mom and dad. If the Court could give me what I have always wanted, the least of which I've always wanted, is that if [Aunt] and [Uncle] were in the place of mom, quote-unquote, mom in the normal type of divorced situation, that I would get what a normal dad would get. That would make me happy. I think that moving to that would have to be slow, because of the fact that I haven't had a lot of access to my kids, but that I think it would be best -- whether they adopted them or whether or not I don't lose my rights, and I get that -- I think what would be best is that I stay involved in their life, and I think it would be detrimental to remove [Aunt] and [Uncle] from their life, as well.

*Id.* at 176-177.

Based on our review, and the foregoing testimonial evidence, we conclude the orphans' court did not commit an error of law or abuse its

- 14 -

discretion in determining that "Father's efforts to overcome the difficulty he experienced spending time with and talking to his children and to engage in a meaningful father-child relationship were insufficient."  Orphans' Court Opinion, 5/19/14, at 11.  We conclude the record demonstrates that Father displayed "merely a passive interest in the development" of the Children, which does not satisfy his parental obligation.  *See In re B.,N.M.*, *supra*. Father acknowledged yielding to the obstacles posed by Aunt and Uncle in maintaining communication and association with the Children.  Orphans' Court Opinion, 5/19/14, at 11.  Father has allowed Aunt and Uncle to satisfy the Children's physical and emotional needs since May of 2008, and he has failed to exercise reasonable firmness in maintaining a parent-child relationship with them.  *Id.*  Therefore, upon our thorough review, we conclude the record supports termination pursuant to Section 2511(a)(1). Father's first issue on appeal fails.

In his second issue, Father argues the orphans' court abused its discretion in terminating his parental rights pursuant to Section 2511(b) because there was insufficient evidence with regard to "the current bond between him and the Children to determine the extent of the bond and the effect on the [C]hildren if the bond were to be severed."  Father's Brief at 20.  We disagree.

With respect to the bond analysis pursuant to Section 2511(b), our Supreme Court confirmed that, "the mere existence of a bond or attachment

of a child to a parent will not necessarily result in the denial of a termination petition." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). The Court further stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *Id.* at 268 (citation omitted). Moreover, the Court directed that, in weighing the bond considerations pursuant to section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The Court observed that, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail, … the result, all too often, is catastrophically maladjusted children." *Id.*

In its Rule 1925(a) opinion, the orphans' court noted that the GAL, who interviewed the Children and visited them in the home of Aunt and Uncle, "did not specifically interview the [C]hildren about their Father, so as not to cause the [C]hildren to become upset." Orphans' Court Opinion, 5/19/14, at 18. Nevertheless, the court stated that the GAL "described all three children as energetic and happy. He observed the Children to show affection toward [Aunt and Uncle]. The GAL's report also indicated that the girls are doing well in school." *Id.* The GAL recommended to the orphans' court that Father's parental rights be involuntarily terminated.[4]

---

[4] Likewise, the GAL filed an appellee brief with this Court in support of the subject decrees.

To the extent Father argues that a bonding evaluation was necessary in this case, we disagree. We have long recognized that, "[i]n analyzing the parent-child bond, the orphans' court is not required by statute or precedent to order a formal bonding evaluation be performed by an expert." *In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa. Super. 2008) (citation omitted). Similarly, we have stated that, "when conducting a bonding analysis, the court is not required to use expert testimony." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citation omitted).

In its Rule 1925(a) opinion, the orphans' court found as follows.

> [T]he [C]hildren do not see Father in a parental role. [Aunt and Uncle] have filled the roles of parents in the [C]hildren's lives since May 2008. By way of example, the girls refer to Father as "Daddy Steve" by their own choice. The [C]hildren refer to [Uncle] as "Daddy." …
>
> …
>
> Despite not having seen their Father since July 2012 and not having spoken with him on the telephone since December 2013 (and only sporadically prior to that), the [C]hildren are doing well. They have, for the most part, overcome the developmental delays that necessitated Early Childhood Intervention services. The twins have largely addressed the issues that necessitated counseling services, and C.E.-M.J.'s counseling sessions are held on [a] less frequent schedule now than they had been in the past, indicating progress. With the exception of some stealing behavior exhibited by C.E.-M.J., the [orphans' c]ourt heard no evidence regarding behavior issues, educational issues, or emotional issues leading the [orphans' c]ourt to believe that their Father's near two-year

absence has caused the [C]hildren to suffer in any significant or measurable way.[5]

According to the credible testimony of [Aunt], the [C]hildren have started to combine their last name with [Uncle's and Aunt's] last name and have asked why their last name cannot be the same as [Uncle and Aunt]. C.E.-M.J. has formed the impression that her parents have walked out of her life.

Orphans' Court Opinion, 5/19/14, at 16-17. Based on our review, we conclude the testimonial evidence supports the orphans' court's findings.

Significantly, Aunt testified on cross-examination by the GAL about why she decided to seek counseling for the Children in March of 2012.

Q. [W]hy did you think that the [C]hildren needed counseling as of March 2012, rather than in the time period before that, when they were in your care? What changed?

A. What changed was that I saw more and more things cropping up that concerned me. I saw [F.N.J.]'s confusion. I saw her frustration with herself as a very bright, little girl when she couldn't make things do exactly what she wanted them to do.

I saw some of [J.M.J.]'s insecurity around other people. She has a tremendous fear of dogs, period.

And I saw [C.E.-M.J.]'s struggles reflected in some of her behavior and in some of the things that she would say – I saw her struggles with I have all these people but what do they mean to my life. And I know she struggled with the thought that

_____

[5] Uncle testified that he and Aunt are seeking a second opinion from a psychologist with respect to whether C.E.-M.J. suffers from Asperger's Syndrome. N.T., 3/25/14, at 79.

her … biological mom and her biological dad – had essentially all but walked away.  That was … the impression that she was forming.

And we wanted to do things to help all three of the girls get past some of these obstacles in their lives.

N.T., 3/25/14, at 115-116.

Finally, Aunt testified about the effect on the Children of terminating Father's parental rights.

> Q.    And what about the termination[] of [Father]'s parental rights, how do you think that will affect [the Children]?
>
> A.    [] I will say this: I do not believe it will as adversely affect them as [Father] may think it will.  They love him.  And I think that's wonderful. They don't see him often enough or hear from him or get cards or letters or anything from him with any consistency that it would cause them damage to have him no longer be their biological father.

*Id.* at 98.

In light of the foregoing testimonial evidence, and after thorough review of the certified record, we discern no error of law or abuse of discretion by the orphans' court in concluding that,

> [T]he [C]hildren certainly love their father. However, Father's sporadic and minimal contact with the [C]hildren cannot be a sound basis to maintain that the [C]hildren would suffer harm if Father's parental rights were terminated.  There is no evidence to suggest that a permanent severance of the bond between Father and the [C]hildren would cause the [C]hildren harm.  In fact, based on the evidence presented, the [C]hildren's best interests would be served by terminating Father's parental

- 19 -

> rights and freeing the [C]hildren for adoption by [Aunt and Uncle].

Orphans' Court Opinion, 5/19/14, at 18-19; *See In re K.K.R.-S.*, *supra* at 535 (clarifying that, "concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound"). Therefore, contrary to Father's assertion, we conclude there was sufficient evidence to support the orphans' court termination of Father's parental rights pursuant to Section 2511(b). Accordingly, Father's final issue on appeal fails.

Based on the foregoing, we affirm the decrees involuntarily terminating Father's parental rights to the Children pursuant to Sections 2511(a)(1) and (b).

Decrees affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/5/2014